Filed 9/6/13  In re Pablo U. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re PABLO U., JR., a Person Coming Under the Juvenile Court Law. | B245684<br>(Los Angeles County<br>Super. Ct. No. CK62325) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PABLO U., SR.,<br><br>    Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Veronica McBeth, Judge.  (Retired judge of the L.A. Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Janice A. Jenkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Navid Nakhjavani, Deputy County Counsel for Plaintiff and Respondent.

# I. INTRODUCTION

The father, Pablo U., Sr., appeals from the juvenile court's jurisdiction and disposition orders. He contends there is insufficient evidence to support the jurisdictional findings under Welfare and Institutions Code section 300, subdivision (b).[1] In terms of the dispositional order, the father argues the juvenile court's factual findings were insufficient. We affirm the orders.

# II. PROCEDURAL HISTORY

## A. Section 300 Petition

On June 13, 2012, the Los Angeles County Department of Children and Family Services (the department) filed a section 300 petition on behalf of the recently born infant, Pablo U., Jr. Count b-1 of the petition alleges the mother, G.J., had used illicit drugs during her pregnancy with the child. The mother had a history of drug use, including methamphetamine and marijuana, which rendered her incapable of caring for the child. Count b-1 also alleges the child's two siblings, Alex J. and Mary J., received permanent placement services because of the mother's illicit drug use. Count b-2 alleges the father had a history of drug use and abused marijuana.

## B. Detention Hearing

At the June 13, 2012 detention hearing, the juvenile court detained the child with temporary placement vested with the department. The juvenile court denied the father's request for custody. However, the juvenile court indicated the father could secure custody depending on his marijuana test results: "And I'm going to indicate that if father

---

[1] Future statutory references are to the Welfare and Institutions Code.

2

-- father test for marijuana. If over the course of three tests -- I will allow weekly tests -- if the tests are -- if his numbers are going down, then I want the child be placed with him for three weeks. I want three consecutive weeks of the numbers going down, and then the child can be placed." The juvenile court ordered weekly drug testing and parenting classes for the parents. The parents were granted monitored visits, two to three times a week for two to three hours per visit.

### C. Jurisdiction Hearing

At the October 2, 2012 jurisdiction hearing, the juvenile court sustained the following count b-1: "The [mother] is a current abuser of marijuana, which renders the mother incapable of providing regular care of the child. The mother used illicit drugs during her pregnancy with the child. The child's siblings, [Alex and Mary J.], received Permanent Placement Services, due to the mother's illicit drug use. The mother's illicit drug use endangers the child's physical health and safety and creates a detrimental home environment, placing the child at risk of physical harm and damage." The juvenile court struck the allegation concerning the father's marijuana use because his serum cannabinoid levels were going down, with the exception of one blood test.

### D. Disposition Hearing

At the November 2, 2012 disposition hearing, the juvenile court denied the father's request for physical custody of the child. The juvenile court explained: "I also think father sincerely loves his child a lot. I found that and I believe that from his testimony and what he has done with respect to the child; but I do not think at this point father is strong enough to protect this child from the mother and for that reason, I am not going to release the child to father at this time." At the hearing, the juvenile court observed the mother appeared either nervous or under the influence of a drug. The juvenile court commented: "As to the mother, I understand she has negative testing and

3

it appears to the court so much of the basic system of somebody who is using now. . . . I hope she is just nervous and that accounts for the behavior I see exhibited before me, but in any event, I think father has taken too long from the time that the child was removed until just recently to have mother move out. I am very concerned if he is probably returned to father and he would not be protective of Pablo from the mother." The November 2, 2012 minute order states: "By clear and convincing evidence pursuant to [section] 361(b): Substantial danger exists to the physical health of minor and/or minor(s) is suffering severe emotional damage, and there is no reasonable means to protect without removal from parent's or guardian's physical custody."

The father was ordered to have eight random drug blood tests, with no missed or dirty tests. The juvenile court stated: "If I do have those [missed or dirty test], then you will have to take the whole [drug and alcohol] program. As long as I have eight random test[s,] and that will go a long way along with the other things. I am going to talk about letting you know that you can indeed provide a safe home for Pablo." The father was granted unmonitored visits, two or three times a week for two to three hours, outside the presence of the mother.

## III. EVIDENCE

### A. Detention Report

The June 13, 2012 detention report stated the department received a referral the day after the mother delivered the child at the hospital. The detention report stated the mother had disclosed her drug abuse history, which included past methamphetamine use and daily marijuana use since she was a teenager. The baby tested negative and did not exhibit any withdrawal symptoms.

On June 8, 2012, children's social worker Jane Gonzalez spoke with the hospital social worker, Marisa Martinez, about the referral. Ms. Martinez reported after the child was born, the mother admitted using marijuana. But the mother was not tested for drugs.

4

The mother found out she was pregnant at seven months and had smoked marijuana daily before she learned of her pregnancy. According to Ms. Martinez, the mother last used marijuana about a month ago. But the mother then changed her story when she was informed the department would be notified.

On that same day, children's social worker Crystal Pimentel spoke with the child's nurse, Marilu Baylosis, at the hospital. The nurse stated the hospital failed to test the mother for narcotics pre-delivery. Ms. Baylosis reported the baby was healthy with no withdrawal symptoms. The mother was bonding with the child and taking care of him appropriately by feeding him on time and changing his diaper.

Ms. Pimentel also interviewed the mother at the hospital. The mother reported her two other children had been adopted. The mother stated she stopped smoking marijuana when she found out she was pregnant at six months. The mother denied stating she used marijuana a month ago. She said: "I didn't say that. I told the nurse that it was months ago not one month ago." The mother explained she was unaware of the pregnancy until she was six months pregnant because she had irregular periods and her stomach did not grow. The mother disclosed she and the father smoked marijuana together. They did not have medical marijuana cards. The mother agreed to drug test and was tested by the hospital. The hospital staff later confirmed the mother tested positive for opiates.

Ms. Pimentel interviewed the father and advised him of the allegations. The father confirmed he smoked marijuana daily and had smoked that day before going to work. He stated smoking marijuana relaxed him and gave him a better attitude. The father resided with the mother and a brother and sister-in-law, Robert and Carolyn L. He stated the mother last smoked marijuana about three months ago when she learned about her pregnancy. The father noticed the mother's stomach was growing and told her to go to a clinic. They went to a clinic and learned about the pregnancy. When informed about the mother's past, the father responded: "I don't care about her past. I just want to move forward with her and my baby."

The detention report discussed a prior dependency case that resulted in termination of the mother's parental rights over her two older children, Alex and Mary. On February

5

8, 2006, the department filed a section 300 petition on behalf of Alex and Mary.  The petition alleged Mary and the mother tested positive for marijuana.  The positive test was returned when Mary was born.  The petition further alleged the mother and the father, Miguel C., were frequent users of marijuana and abused illicit drugs while caring for Alex.  The juvenile court sustained the petition on March 2, 2006.  On August 7, 2007, the juvenile court returned the children to the parents and terminated the suitable placement order.

On March 9, 2009, the juvenile court sustained another petition alleging the mother and Miguel C. physically abused two-year old Mary.  During a medical examination on October 22, 2008, Mary was found to be suffering from severe injuries.  The injuries included bruises and abrasions to her eye, chest, right elbow and legs, and cigarette burns on her legs and buttocks.  Miguel abused Mary by striking her with a paddle, a cord, a belt, and his hands.  Miguel also pushed her into a wall causing her to lose consciousness.  On October 22, 2008, Miguel was arrested for injuring Mary.  The mother also abused Mary.  The mother struck Mary with a cord and belt.  Also, the mother choked Mary around the neck.  In addition, the mother struck the child's face on numerous occasions.  Each parent failed to protect Mary from the abuse of the other.  The juvenile court also sustained a domestic abuse allegation.  The petition alleged the parents had a history of domestic violence.  On one occasion, Miguel struck the mother's face in the children's presence.  Finally, the juvenile court sustained an allegation that Miguel violated a court order by allowing the mother to reside in the children's home and to have unlimited access to them.  The  parental rights of the mother and Miguel were terminated and Alex and Mary received permanent placement services.  Their adoption was finalized on June 10, 2011.

Ms. Pimentel spoke with Shantie Blair, the social worker assigned to the mother's prior case.  Ms. Blair reported the mother did not comply with the prior court orders.  At one point, the mother disregarded a court order by living at home with Alex and Mary.  The mother also abused methamphetamine at one point.

## B. Jurisdiction/Disposition Report

The July 18, 2012 jurisdiction/disposition report was prepared by children's social worker Lorena Moya. The mother admitted she used marijuana on a daily basis but stopped smoking after she learned she was six months pregnant. The mother received prenatal care following confirmation of her pregnancy.

The mother reported smoking marijuana since she was 12 years old. At the age of four, she witnessed her father, the maternal grandfather, smoking marijuana. The father was aware of the mother's drug use because the parents smoked marijuana together. The mother claimed marijuana relaxed her and helped her with her asthma. The mother admitted prior methamphetamine use. The mother said: "I started meth at the age of 13 or so and I used it off and on until 2006, when my other kids were taken away. I wasn't a frequent user of meth. I mean there were times when I didn't use for a really long time, like years and then I started to use again."

The father admitted he and the mother smoked marijuana together. He stated: "Before she (mother) was pregnant, we were both smoking weed on a daily basis. I smoked two joints in one day, every day. I smoked once in the morning, before work and another joint after work. She (mother) was smoking weed before I met her. I started going out with her (mother) a year ago." The father indicated he has been smoking marijuana since he was 15 or 16 years old. At 18, he started using methamphetamine every day, twice a day but stopped in 2008 after he participated in a drug program.

Ms. Moya reported the father's home was assessed for placement. The father's home was furnished with necessities for the child including a crib, clothes, bottles, wipes, an infant tub and shoes. The father agreed to obtain diapers and formula once the child was released. The father resided with a paternal uncle, Robert L. Also living in the residence was Robert's girlfriend, Carolyn E. Carolyn's brother lived in a shed in the backyard. The other residents had not been live scanned or interviewed by department staff.

## C. Addendum Report

The July 25, 2012 addendum report indicated the mother had enrolled in a substance abuse and parenting program on June 25, 2012. At a July 19, 2012 meeting with Ms. Moya and children's social worker April Dejohnette, the father stated he was unaware of the mother's severe physical abuse of the child's half-sibling, Mary, in 2009. On July 24, 2012, the department staff held a team decisionmaking meeting with the parents to discuss return of the child to the father's home. The father indicated he did not believe the mother abused Mary. The father stated, "I have known her (mother) for over a year and I don't think that she could hurt a child like that. I see how she is with our son." Ms. Moya expressed concerns about the father's ability to protect the child from the mother. In response, the father rolled his eyes and mumbled, "Whatever." But the father reiterated he would protect the child and not allow the mother in the home should the court make that order. For childcare, the father stated he would have the maternal grandmother take care of the child while he worked. Ms. Moya indicated the father was receptive to having the child placed with the maternal grandmother while the parents remained together in the home. The father stated: "Yeah, that's good. I don't mind the baby being with her (maternal grandmother) until we get him [the child] back."

## D. Interim Review Reports

The October 2, 2012 interim review report stated the parents had participated in substance abuse and parenting classes since June 15, 2012. Each parent had five negative drug tests in August and September. The foster mother reported the mother was a little rough with the child and did not seem confident when caring for him. The foster mother observed the father exuded confidence when caring for the child. The father held the child. Also, the father would change and feed the child during visits. The father appeared very loving and affectionate with the child.

The report indicated the mother's drug use had affected the child's well-being. According to the initial medical exam, the child exhibited stiffness in his extremities indicative of withdrawal symptoms. The report also indicated the child kept his hands in a fisted position, did not bear weight on his legs, avoided eye contact during feedings, and was a restless sleeper. The report states: "It is suspected that the mother might have also engaged in methamphetamine use due to the child's exhibiting withdrawals. The child was referred to the Regional Center for evaluation and results show that the child presents slight skills in all areas of development tested except in the area of cognition."

The November 2, 2012 interim review report indicated the father missed two drug tests. The laboratory reported the father missed drugs tests on September 28 and October 1, 2012. The father stated he had gone to the testing site but his name was not on the list. A children's social worker, Ms. Dejohnette, called the laboratory and was informed the father's name was on the list. The father later agreed to submit to an on demand test on October 4, 2012 and tested negative for drugs.

On October 9, 2012, Ms. DeJohnette met with the parents, the foster mother, and Vicky Baeza, the Regional Center service coordinator. Ms. Baeza stated she was concerned about the child's jerky head movement because it was a sign of withdrawal. The child qualified for early start services which would begin in two weeks.

On October 25, 2012, Ms. Moya made an unannounced visit to the father's home. Ms. Moya visited to confirm that the mother had moved out. The mother stated to the juvenile court that she would move out of the home. However, the mother was present and greeted Ms. Moya. The mother stated: "I'm almost all moved out. I'm at my mom's house." According to Ms. Moya's report: "When asked if she had moved out of the house, the mother replied, 'I'm not going to take all my things out. Most of what's in the room is mine and my mom doesn't have the room to fit all my things. I'm coming back to the house so I don't see why I have to have everything gone.'" The mother appeared upset. Ms. Moya clarified that the department was not asking the mother to leave the house. Rather, it was mother who had made this proposal in court. The mother stated, "'[We] were being pressured for me to leave the house. [The father's] attorney

keeps yelling at [him] and telling him that I need to leave.'" Ms. Moya recommended the child remain in foster care while the parents continued with their programs. The mother responded: "Well, I think that's a good plan too. I think it would be better for the baby to stay where he's at until me and [the father] could get the baby back."

The father, who had been in the shower, walked in on the conversation between the mother and Ms. Moya. The father stated he did not want the mother to leave but had been pressured by his attorney, Donna Bernstein. Ms. Moya asked the father what he wanted and the mother interjected saying, "We think it would be better if the baby stayed where he's at." Ms. Moya requested the mother allow the father to speak on his own behalf. The father replied: "We're a team. We are each other's support and I think it would be better for the baby to stay where he's at until we can both get the baby back." The father added the parents were being cooperative with their programs and should have the child returned to their care. Ms. Moya explained the mother only admitted using marijuana. But the Regional Center staff suspected the mother had used methamphetamine because of the child's withdrawal symptoms. The mother did not argue with Ms. Moya's statement, and replied: "Oh yeah? Ok." Ms. Moya observed the father sighing in disbelief when she explained the child's withdrawal symptoms were caused by prenatal drug exposure. The father then changed his mind and stated: "I want my son. I want him. I don't want to wait." Ms. Moya wrote: "The father stated he wanted the mother to move out in order to have his son with him. The mother then replied, 'Ok. If that's what you want.'"

When asked about the childcare plan, the father stated he would ask the maternal grandmother or his roommate, Carolyn, to care for the child. The father had not yet spoken with Carolyn. But the mother has talked to Carolyn about caring for the child. Carolyn, who came out of her bedroom with her infant daughter, acknowledged the parents had asked her to care for the child. Ms. Moya was unable to see Carolyn's bedroom to ensure the infant had a crib. This was because Carolyn claimed she was locked out of her bedroom. All the residents at the father's home had been live scanned except for the paternal uncle who traveled extensively for work.

10

## IV. DISCUSSION

### A. Standard of Review

We review the juvenile court's jurisdictional findings for substantial evidence. (*In re E.B.* (2010) 184 Cal.App.4th 568, 574-575; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) We review a removal order for substantial evidence in the light most favorable to the juvenile court's rulings. (*In re Miguel C.* (2011) 198 Cal.App.4th 965, 969; *In re Mariah T.* (2008) 159 Cal.App.4th 428, 441.) Issues of fact, weight and credibility are the provinces of the juvenile court. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393; *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.)

### B. Jurisdictional Findings

Section 355, subdivision (a) provides: "At the jurisdictional hearing, the court shall first consider only the question whether the minor is a person described by Section 300. Any legally admissible evidence that is relevant to the circumstances or acts that are alleged to bring the minor within the jurisdiction of the juvenile court is admissible and may be received in evidence. Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300 . . . . " Section 300, subdivisions (b) states: "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶] . . . (b) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ." To establish jurisdiction under section 300, subdivision (b), the department must prove by a preponderance of the evidence that: there was neglectful conduct by the parent in one of the specified forms; causation; and "serious physical harm or illness" to the child or "substantial risk" of such harm or illness. (*In re B.T.* (2011) 193 Cal.App.4th 685,

11

692; *In re Ricardo L., supra,* 109 Cal.App.4th at p. 567.) The father, a non-offending parent, challenges the section 300, subdivision (b) jurisdictional findings made against the mother. The father has standing to appeal because he was aggrieved by the juvenile court's assumption of jurisdiction over the child. (*See In re K.C.* (2011) 52 Cal.4th 231, 239-240; see *Canaan Taiwanese Christian Church v. All World Mission Ministries* (2012) 211 Cal.App.4th 1115, 1122.)

Substantial evidence supports the jurisdictional findings under section 300, subdivision (b). It is undisputed the mother has a substance abuse history. In 2006, the mother and Mary tested positive for marijuana at the time of that child's birth. The juvenile court took jurisdiction over the children, Mary and her older brother, Alex. Jurisdiction was assumed because of the mother's marijuana abuse. The mother regained custody of Alex and Mary in August 2007. However, in March 2009, the mother lost custody of Alex and Mary. This resulted when the mother and the father, Miguel C., physically abused then two-year old Mary. The children's social worker assigned to the prior case reported the mother abused methamphetamine at one point. The mother also violated a court order by living in the home with the children when she has been ordered to move out. The mother failed to comply with court-ordered services and her parental rights over Alex and Mary were terminated. Alex and Mary participated in permanent placement services and were adopted in June 2011.

The mother did not resolve her substance abuse problem. The mother acknowledged she used marijuana on a daily basis since she was 12 years old. The father was aware of the mother's drug use because the parents smoked marijuana together. The mother also admitted she used methamphetamine in the past. She said: "I started meth at the age of 13 or so and I used it off and on until 2006, when my other kids were taken away. I wasn't a frequent user of meth. I mean there was times when I didn't use for a really long time, like years and then I started to use again."

The mother admitted using marijuana on a daily basis while pregnant with the child. The mother reported she stopped using marijuana three months before giving birth to the child, when she was six or seven months pregnant. However, the hospital social

12

worker discussed the marijuana issue with the mother. During that discussion, the mother stated she used marijuana about one month before giving birth to the child. The mother changed her story when she was told the department would be contacted by the hospital staff.

The father argues the child did not suffer harm from the mother's marijuana use. But the October 2, 2012 interim review report stated the child exhibited stiffness in his extremities indicative of withdrawal symptoms at the initial medical examination. The report also indicated the child kept his hands in a fisted position, did not bear weight on his legs, avoided eye contact during feedings, and was a restless sleeper. The report states: "It is suspected that the mother might have also engaged in methamphetamine use due to the child's exhibiting withdrawals. The child was referred to the Regional Center for evaluation and results show that the child presents slight skills in all areas of development tested except in the area of cognition." The evidence amply supports the jurisdictional findings under section 300, subdivision (b).


C. Removal Order


Section 361, subdivision (c)(1) provides: "A dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . : [¶] (1) [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody. . . . The court shall also consider, as a reasonable means to protect the minor, allowing a nonoffending parent or guardian to retain physical custody so long as that parent or guardian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm." Section 361, subdivision (d) states: "The court

13

shall make a determination as to whether reasonable efforts were made to prevent or eliminate the need for removal of the minor from his or her home . . . . The court shall state the facts on which the decision to remove the minor is based." The purpose of section 361 is to avert harm to the child. The parent need not be dangerous nor the child actually harmed before removal is appropriate. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917; *In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136, disapproved on another ground in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.) The juvenile court may consider both the parent's past conduct and the present circumstances. (*In re Cole C., supra,* 174 Cal.App.4th at p. 917; *In re S.O.* (2002) 103 Cal.App.4th 453, 461.)

The father argues the juvenile court failed to make express findings as required by section 361, subdivisions (c) and (d). We disagree. At the November 2, 2012 disposition hearing, the juvenile court removed the child from the father's custody because: the father took "too long from the time that the child was removed until just recently to have mother move out"; the mother appeared nervous or under the influence of a drug at the hearing; and the father was not strong enough to protect the child from the mother. The juvenile court's statement of reasons support a clear and convincing evidence finding. The mother's life-long narcotics abuse endangered the child who was born with symptoms of drug intoxication. Coupled with her methamphetamine abuse, the father's indolent enabling with his own drug abuse was sufficient to warrant removal.

14

## V. DISPOSITION

All orders under review are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


TURNER, P. J.


We concur:


MOSK, J.


KRIEGLER, J.